## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ADAM D. FERRARI and PHOENIX
CAPITAL GROUP HOLDINGS, LLC,

        Plaintiffs,

    v.

FORBES MEDIA LLC,

        Defendant.

Civil Action No. 25-12-GBW

---

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE; Thomas A. Clare, P.C., Joseph R. Oliveri, David Sillers, CLARE LOCKE LLP, Alexandria, VA.

    *Counsel for Plaintiffs*

Jessica C. Watt, BALLARD SPAHR LLP, Wilmington, DE; Elizabeth Seidlin-Bernstein, BALLARD SPAHR LLP, Philadelphia, PA.

    *Counsel for Defendant*

.

## MEMORANDUM OPINION

August 1, 2025
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Pending before the Court is Defendant Forbes Media LLC's ("Forbes" or "Defendant") Motion to Dismiss Plaintiffs' Complaint ("Motion" or "Motion to Dismiss") (D.I. 8), which has been fully briefed (D.I. 9; D.I. 16; D.I. 23). In summary, Plaintiff Adam D. Ferrari ("Mr. Ferrari") and Plaintiff Phoenix Capital Group Holdings, LLC ("Phoenix Capital") (together, "Plaintiffs") allege that Forbes defamed Plaintiffs by publishing an article that implies that Phoenix Capital, which is run by Mr. Ferrari, is a Ponzi scheme. However, the Article cannot, as a matter of law, be reasonably understood to imply that Phoenix Capital is a Ponzi scheme. Thus, the Court grants Forbes' Motion to Dismiss. The Court sets forth its analysis below.

## I.    FACTUAL BACKGROUND

The following are factual allegations taken as true for the purpose of Forbes' Motion to Dismiss.

On October 8, 2024, Forbes published an article titled "Buyer Beware: These Yield-Gushing Oil Bonds Could Derail Your Retirement" (the "Article"). D.I. 1-1, Ex. A (the Article); *see* D.I. 1-1, Ex. 1 (the Complaint) ¶ 60.[1] The Article reports that Mr. Ferrari started an oil and gas company called Phoenix Capital that also sells high yield bonds. D.I. 1-1, Ex. A. While the Article explicitly describes Phoenix Capital as "Denver-based oil and gas company," the Article

---

[1] While Exhibit A, which is attached to the Complaint in the Notice of Removal, is a copy of the Article, the copy omits language appearing directly under the photo at the beginning of the Article, namely, the italicized portion of the following sentence: "Adam Ferrari named his oil company Phoenix Capital Group to honor his family's resilience. Yet, the *firm more closely resembles a chimera, part energy producer, part junk bond dealer.*" *See* Brandon Kochkodin, *Buyer Beware: These Yield-Gushing Oil Bonds Could Derail Your Retirement*, Forbes (October 8, 2024), https://www.forbes.com/sites/brandonkochkodin/2024/10/08/buyer-beware-these-yield-gushing-oil-bonds-could-derail-your-retirement/. The entire article is incorporated by reference.

2

also states that "Phoenix says it's an oil and gas company, specializing in acquiring mineral rights and drilling independently, but its core competency seems to be raising funds from yield hungry investors." D.I. 1-1, Ex. A at 2, 4.

The Article reports on several categories of information, including, in no particular order, (1) Phoenix Capital's revenue and profitability, (2) Phoenix Capital's financing strategy, (3) the target market for Phoenix Capital's high yield bonds, (4) the interest payment structure for some of Phoenix Capital's high yield bonds, (5) the commission structure for the sales of Phoenix Capital's high yield bonds, (6) possible federal investigations into Phoenix Capital, and (7) Mr. Ferrari's criminal history, reputation and family. These are discussed in turn below.

*First*, the Article reports on Phoenix Capital's revenue and profitability. For example, Phoenix Capital reportedly "had total revenues of $118.1 million and losses of $48.3 million" in 2023 and revenues of $120.5 million and losses of $20.6 million in the first half of 2024. D.I. 1-1, Ex. A at 9-10. In addition, the Article reports that Mr. Ferrari assures investors that Phoenix Capital "can be profitable even if oil falls to $30 per barrel, despite the fact that a March 2024 survey by the Federal Reserve Bank of Dallas shows that, on average, oil companies need at least $64 per barrel to profitably drill." D.I. 1-1, Ex. A at 11.[2]

*Second*, the Article reports that Phoenix Capital is "100% debt financed" and characterizes Phoenix Capital's financing strategy as "aggressive" and "novel." D.I. 1-1, Ex. A at 5, 8. The

---

[2] In their Complaint, Plaintiffs allege that these statements are false. In particular, Plaintiffs allege: "Mr. Ferrari explained the $30 per barrel figure to Mr. Kochkodin before the Article was published: it represents the minimum price per barrel of oil necessary to break even on production expenses. In other words, at approximately $30 per barrel, a given well site would cover the costs associated with establishing the well. However, as Mr. Ferrari explained to Mr. Kochkodin before publication, that is a limited view of break-even because it does not account for any organizational overhead expenses associated with putting a drill in the ground." D.I. 1, Ex. 1 ¶ 71.

Article reports that "the average energy company in the S&P 1500 has a debt to EBITDA[3] ratio of 2x" and that Phoenix Capital had a debt to EBITDA ratio of "19x at the end of 2023." D.I. 1-1, Ex. A at 10. The Article reports, however, that Mr. Ferrari expects Phoenix Capital's EBITDA "to be between $125 and $135 million" by the end of 2024, which "could bring the ratio down to between six and ten times." D.I. 1-1, Ex. A at 10. The Article also reports that an industry expert "says that for industrial firms anything over 3x is typically considered speculative" and that over "eight or nine times gets into triple C land, which predicts very, very risky credit." D.I. 1-1, Ex. A at 10. Furthermore, the Article reports that another industry expert "cautions that Phoenix's unsecured bonds are relying on so-called probable reserves for their payout" even though "Bankers won't give you a loan on probable reserves." D.I. 1-1, Ex. A at 11. Reportedly, "Aubrey McClendon (the disgraced former CEO of Chesapeake Energy who Forbes once called 'America's Most Reckless Billionaire') tried that and, of course, it didn't work." D.I. 1-1, Ex. A at 11. The Article states that Phoenix Capital's bond sales are made pursuant to "Congress's Jumpstart Our Business Startups (JOBS) Act." D.I. 1-1, Ex. A at 3. In addition to bonds, Phoenix Capital reportedly also "secured a $135 million loan from . . . Fortress Investment Group." D.I. 1-1, Ex. A at 12. The Article states that "there's nothing stopping Phoenix from using the funds collected from retail investors to meet its obligations to the Wall Street behemoth [Fortress]." D.I. 1-1, Ex. A at 13.

*Third*, the Article reports on the target market for Phoenix Capital's high yield bonds. D.I. 1-1, Ex. A. For example, "some 95% of" Phoenix Capital's sales are reportedly "to people above the age of 55, with half of the funds coming from 401(k)s and IRAs." D.I. 1-1, Ex. A at 2. The Article reports that, while "banks would likely shun" the company's "high leverage," these

---

[3] Earnings Before Interest, Taxes, Depreciation, and Amortization.

investors "are less likely to scrutinize [Phoenix Capital's] balance sheet" in light of the high yields (9% to 13%), i.e., "prices you will never see on a Bloomberg terminal." D.I. 1-1, Ex. A at 8. Phoenix Capital reportedly solicits its purchasers from "advertising run on conservative radio shows like Hannity" and "a barrage of enticing webinars," "which it holds daily." D.I. 1-1, Ex. A at 1-2. The Article advises readers to not "expect Phoenix to ease up on selling its risky oil bonds to retirement minded investors anytime soon" since the company "announced a new confidential draft submission to the SEC to register its bonds" to "allow them to bypass the annual $75 million issuance limit on Reg A offerings, which are open to non-accredited investors." D.I. 1-1, Ex. A at 11-12. The Article also reports that one of Phoenix Capital's representatives "claims his widowed mother invested $500,000 in the bonds." D.I. 1-1, Ex. A at 3.

*Fourth*, the Article reports on the interest payment structure for some of Phoenix Capital's high yield bonds. Reportedly, "50% of the bonds sold to retail investors feature payment-in-kind provisions, where interest payments are made with additional bonds instead of cash." D.I. 1-1, Ex. A at 10. According to the Article, this arrangement means that Phoenix Capital "records the full interest expense on its income statement, but in reality, [Phoenix Capital] pays out only about half of that each year." D.I. 1-1, Ex. A at 10.

*Fifth*, the Article reports on the commission structure for the sales of Phoenix Capital's bonds. While "companies offering private placement securities generally aren't allowed to even take a commission directly from investors," the Article reports that "Phoenix gets around this" using "broker-dealer named Dalmore Group" to sell the securities and that the "opportunistic" broker-dealer uses salesmen that, while "technically licensed as brokers through . . . Dalmore Group," are affiliated with Phoenix Capital's webinar team. D.I. 1-1, Ex. A at 8-9. Furthermore, the Article reports that, while the Dalmore Group takes a 5% commission, it "kick[s] back" 80%

of this 5% commission to "Phoenix and its salesmen." D.I. 1-1, Ex. A at 9. The Article reports that the commission structure is, "mostly via the JOBS Act provisions, a DIY way to legally sell [Phoenix Capital's] own securities [through] an SEC registered broker." D.I. 1-1, Ex. A at 9.

*Sixth*, the Article reports on possible federal investigations into Phoenix Capital. For example, the Article reports that three "people familiar with Ferrari's oil bond operation have told Forbes that the Securities and Exchange Commission was investigating Phoenix for potentially misleading statements in its offerings." D.I. 1-1, Ex A at 13-14. The Article reports that Mr. Ferrari "doesn't deny the existence of an investigation" and that, in fact, Mr. Ferrari reports "regular communication with the SEC . . . as a normal part of . . . business." D.I. 1-1, Ex A at 14. Notwithstanding, the Article Reports that Phoenix Capital represented that it had "no knowledge of any investigations by a governmental authority," a representation that was reportedly required by Phoenix Capital's "agreement with Fortress." D.I. 1-1, Ex. A at 13.

*Seventh*, the Article reports on Mr. Ferrari's criminal history, reputation and family. D.I. 1-1, Ex. A. For example, the Article reports that in 2019, Mr. Ferrari "pleaded guilty to felony theft in Colorado" for "cheating a mineral rights holder and Anadarko Petroleum out of $300,000." D.I. 1-1, Ex. A at 6. The Article further reports that Mr. Ferrari, notwithstanding his guilty plea, claims innocence and that "the episode was the result of a 'corporate hit job' brought on by a competitor." D.I. 1-1, Ex. A at 6. In addition, the Article reports that Mr. Ferrari "and his companies have been involved in numerous lawsuits" and that Mr. Ferrari "has gone to great lengths to clear his name, including hiring a reputation management firm which has created dozens of websites, blogs and social media posts on his behalf in an attempt to bury bad news related to his past." D.I. 1-1, Ex. A at 7. Finally, the Article reports that Mr. Ferrari's father "was paralyzed

6

in 2016 from transverse myelitis, an affliction the family believes was triggered by the flu vaccine." D.I. 1-1, Ex. A at 4.

In addition, a search description of the Article from Forbes' website states: "Phoenix Capital Group, an unprofitable oil firm selling high-yield debt to retirees led by a CEO whose past guilty plea for theft they'd rather you not know about." D.I. 1, Ex. 1 ¶ 139; *see* D.I. 9 at 7 & n.5 (explaining that this statement was part of the search description and not the Article itself).

## II.    PROCEDURAL HISTORY

On December 5, 2024, Mr. Ferrari and Phoenix Capital filed a Complaint against Forbes in the Delaware Superior Court. *See* D.I. 1-1, Ex. 1. The Complaint alleges that Forbes defamed *Phoenix Capital* by implication by publishing and juxtaposing statements in the Article "to imply a false and defamatory connection between them or otherwise create the false and defamatory implications that Phoenix is a dishonest company that runs an illegitimate business that preys on its debt-holders, including by holding itself out as an oil and gas company but in fact operating as a Ponzi scheme that defrauds its debt-holders by promising high returns with little or no risk and using money obtained from new investors to pay prior investors." D.I. 1-1, Ex. 1 ¶ 123 (also enumerating specific statements alleged to constitute defamation by implication).

The Complaint similarly alleges that Forbes defamed *Mr. Ferrari* by implication by publishing and juxtaposing statements in the Article "to imply a false and defamatory connection between them or otherwise create the false and defamatory implications that Mr. Ferrari founded, operates, runs, and is the CEO of a dishonest company—Phoenix—that runs an illegitimate business that preys on its debt-holders, including by holding itself out as an oil and gas company but in fact operating as a Ponzi scheme that defrauds its debt-holders by promising high returns with little or no risk and using money obtained from new investors to pay prior investors." D.I. 1-

7

1, Ex. 1 ¶ 139 (also enumerating specific statements alleged to constitute defamation by implication).

In other words, the Complaint alleges that the Forbes Article defamed Phoenix Capital and Mr. Ferrari by implying that Phoenix Capital, which is run by Mr. Ferrari, is a Ponzi scheme.

On January 6, 2025, Forbes removed the action to this Court. D.I. 1. On January 15, 2025, Forbes filed the present Motion to Dismiss. D.I. 8. In its opening brief in support of dismissal, Forbes contends that (A) "[t]he alleged implication of a Ponzi scheme is not reasonably capable of being derived from the Article," (B) "[e]ven if the Article implied a Ponzi scheme, it would be constitutionally protected opinion," and (C) "Plaintiffs do not, and cannot, plead that Forbes published the alleged implication with actual malice." D.I. 9, 11, 14. On February 12, 2025, Mr. Ferrari and Phoenix Capital filed a brief in opposition to Forbes' Motion to Dismiss, contesting each of Forbes' contentions. D.I. 16. On February 26, 2025, Forbes filed a reply brief in further support of its Motion. D.I. 23. On March 19, 2025, the Court stayed discovery pending resolution of Forbes' Motion to Dismiss. D.I. 28.

## III.   JURISDICTION

"The removing party bears the burden to establish federal subject matter jurisdiction." *See Mithril GP Emple. Feeder LLC v. McKellar*, No. 19-cv-2144-RGA, 2021 U.S. Dist. LEXIS 143063, at \*2 (D. Del. July 30, 2021) (citing *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 346 (3d Cir. 2013)). Here, the removing party, Forbes, alleges diversity jurisdiction. D.I. 1 ¶ 3.

Phoenix Capital and Forbes are limited liability companies ("LLCs"). D.I. 1-1, Ex. 1 ¶¶ 12, 14. The "citizenship of an LLC is determined by the citizenship of its members." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010). When "an LLC has, as one of its members, another LLC," citizenship "must be traced through however many layers of partners or

members there may be' to determine the citizenship of the LLC." *Id.* (quoting *Hart v. Terminex Int'l*, 336 F.3d 541, 543 (7th Cir. 2003)).

Where, like here, "a defendant limited liability company removes an action on the basis of diversity jurisdiction, it must plead the citizenship of each of its members because it is the proponent of diversity jurisdiction and has that information in its possession." *Weiss v. Friedman Realty Grp., Inc.*, No. 20-cv-3671, 2020 U.S. Dist. LEXIS 166392, at *4 (E.D. Pa. Sep. 11, 2020). Here, Forbes (the removing party) satisfies this obligation in its Notice of Removal, declaring that "Forbes' sole member is Forbes Global Media Holdings, Inc., which is incorporated and has its principal place of business in the British Virgin Islands." D.I. 1 ¶ 5.

In addition, where the plaintiff is a limited liability company, a defendant asserting diversity jurisdiction on removal "need not affirmatively allege the citizenship of each member" of the plaintiff limited liability company to remove the action. *See Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 102 (3d Cir. 2015).[4]  Indeed, these "members may be unknown to the [defendant] even after a diligent . . . investigation" predating the notice of removal. *Id.* Instead, "if the [defendant] is able to allege in good faith, after a reasonable attempt to determine the identities of the members of the [plaintiff limited liability company], that [defendant] is diverse from all of those members [of the plaintiff limited liability company], [defendant's] [notice of removal] will survive a facial challenge to subject-matter jurisdiction." *Id.* "If the [plaintiff] thereafter mounts a factual challenge, the [defendant] is entitled to limited discovery for the purpose of establishing that complete diversity exists." *Id.*

---

[4] While *Lincoln* concerned a plaintiff alleging the citizenship of a defendant LLC in a complaint, the same logic applies to a defendant alleging the citizenship of a plaintiff LLC in a removed action. *See Mithril GP Emple. Feeder LLC v. McKellar*, No. 19-cv-2144-RGA, 2020 U.S. Dist. LEXIS 104382, at *3 (D. Del. June 15, 2020) (explaining that the "same logic" from *Lincoln* "applies to remand decisions").

Here, Forbes alleged in its Notice of Removal that Phoenix Capital's "sole member is Phoenix Equity Holdings, LLC" ("Phoenix Holdco"). D.I. 1 ¶ 8.[5]  Forbes also alleged that "Phoenix Holdco's members include Lion of Judah Capital, LLC, Curtis Allen, and Sean Goodnight." D.I. 1 ¶ 9. Forbes alleged that, on information and belief, "Curtis Allen is a citizen of California" and "Sean Goodnight is a citizen of Colorado." D.I. 1 ¶¶ 11, 12. Forbes alleged that "the members of Lion of Judah Capital, LLC" ("LCJ") "are Daniel Ferrari and Charlene Ferrari, both of whom are Illinois citizens." D.I. 1 ¶ 10; *see* D.I. 3-1, Ex. A at 4 ("Daniel Ferrari and Charlene Ferrari each own 50% of the voting membership interest in, and are the managers of, LCJ."). Forbes also alleged that, on information and belief, "no other members of Phoenix Holdco are citizens of the British Virgin Islands or any other foreign state." D.I. 1 ¶ 13. Finally, Forbes alleged that Mr. Ferrari is a citizen of California. D.I. 1 ¶ 6 (citing D.I. 1-1, Ex. 1 ¶ 13).

On the basis of the foregoing, Forbes has, for the purpose of its removal, sufficiently alleged diversity of citizenship, since Forbes (a citizen of the British Islands) is, at least on the basis of the representations before the Court, diverse from Plaintiffs (citizens of, at least, California, Colorado, and Illinois).

Notwithstanding, should the Plaintiffs elect to file an amended complaint, the Court will order Plaintiffs to advise the Court of the citizenship of the members of Phoenix Capital, the members of any members of Phoenix Capital, and so forth. *See Dakota Asset Servs. LLC v. Nixon*, No. 19-cv-16126-NLH-JS, 2020 U.S. Dist. LEXIS 243561, at *1-2 (D.N.J. Dec. 29, 2020) (observing that the court ordered "the parties to submit a joint certification as to their citizenship so the Court could assess whether diversity amongst the parties existed" where the defendant

---

[5] In making its allegations concerning the membership of Phoenix Capital, Forbes relies on Phoenix Capital's December 27, 2024 Amendment No. 1 to Form S-1 Registration Statement). D.I. 1 ¶ 8 (citing D.I. 3-1, Ex. A).

removed the action to federal court without alleging citizenship of any of the parties and where the plaintiff was a limited liability company whose members informed the diversity analysis).

With respect to the amount in controversy, it "must appear to a legal certainty that the claim is really for less than" $75,000 "to justify dismissal." *Dardovitch v. Haltzman*, 190 F.3d 125, 135 (3d Cir. 1999). Here, no such certainty exists and neither party contends otherwise. *See, e.g.*, D.I. 1 ¶ 15 ("Plaintiffs do not specify the amount of damages they seek. However, they allege that Forbes' publication of a news article 'caused enormous economic harm to' them.").

For the foregoing reasons, the Court is satisfied that it has subject matter jurisdiction under 28 U.S.C. § 1332(a).

## IV.    LEGAL STANDARD

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Such a claim must plausibly suggest "facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Iqbal*, 556 U.S. 662, 678). But the Court will "'disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements.'" *Princeton Univ.*, 30 F.4th 335, 342 (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)).

In evaluating a motion to dismiss, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Pinnavaia v. Celotex Asbestos Settlement Tr.*, 271 F. Supp. 3d 705, 708 (D. Del. 2017) (quoting *In re Burlington*

*Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)), *aff'd*, 2018 U.S. App. LEXIS 38873 (3d Cir. Apr. 6, 2018). Rule 12(b)(6) requires the Court to "accept all factual allegations in a complaint as true and take them in the light most favorable to Plaintiff." *Brady v. Media*, No. 23-cv-1078-GBW, 2024 U.S. Dist. LEXIS 160991, at *4 (D. Del. Sep. 6, 2024). "A motion to dismiss 'may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief.'" *McCrone v. Acme Markets*, 561 F. App'x 169, 172 (3d Cir. 2014) (quoting *Burlington Coat Factory*, 114 F.3d at 1420). The "movant bears the burden of demonstrating that the complainant failed to state a claim upon which relief may be granted." *Abbott Diabetes Care, Inc. v. DexCom, Inc.*, No. 23-cv-239-KAJ, 2024 U.S. Dist. LEXIS 96985, at *4 (D. Del. May 31, 2024).

## V.    DISCUSSION

As described above, the parties dispute *inter alia* whether the Article and statements therein can, as a matter of law, be reasonably understood to imply a Ponzi scheme. The answer to that inquiry is no.

Under Delaware law,[6] defamation by implication requires "statements" that "can be reasonably understood to imply defamatory and provably false facts about" the plaintiff(s). *Cousins v. Goodier*, 283 A.3d 1140, 1158 (Del. 2022).[7] Whether the accused statements are

---

[6] The Court applies Delaware law in this Memorandum Opinion for three reasons. *First*, both parties rely primarily on Delaware law in their briefs. *See, e.g.*, D.I. 9 at 9 (relying on Delaware law); D.I. 16 at 4 (relying, at least in part, on Delaware law). *Second*, neither party asserts that the Court should apply different law. *See* D.I. 9; D.I. 16; D.I. 23; *see also Christiansen v. Multi-Color Corp.*, No. 1:22-cv-01086-TMH, 2024 U.S. Dist. LEXIS 127629, at *6 n.3 (D. Del. July 19, 2024) (applying Delaware law because the parties had "not argued for this Court to apply a different state's" law). *Third*, it "is often premature to conduct a choice of law analysis at the motion to dismiss stage," i.e., the current stage of this action. *W. R. Berkley Corp. v. Becker*, Civil Action No. 20-1122-RGA, 2022 U.S. Dist. LEXIS 27843, at *7 (D. Del. Feb. 16, 2022).

[7] It is ironic that Mr. Ferrari and Phoenix Capital criticize Forbes for purportedly relying on a case that relies on a case applying Virginia law when Mr. Ferrari and Phoenix Capital similarly rely on

defamatory "is a question of law." *Id.* at 1147. Delaware courts "do not dismiss a claim if it would succeed on any reasonably conceivable set of facts." *Id.*

Here, Plaintiffs point to a number of statements in the Article that they believe can be reasonably understood to imply a Ponzi Scheme. D.I. 16 at 5-6. However, while these statements could, for example, be reasonably understood to imply that Phoenix Capital was aggressively selling risky bonds to retirees, none of the statements, either individually or collectively, can be reasonably understood to imply that Phoenix Capital was paying early bond purchasers with proceeds from the bond sales to new purchasers, i.e., the cornerstone of a Ponzi operation.

For example, the Article's statements that Phoenix Capital employed a "barrage of enticing webinars" to solicit "retirement minded investors" as investors for bonds with "prices you will never see on a Bloomberg terminal" (D.I. 1-1, Ex. A at 1, 8, 11) cannot be reasonably understood to imply that Phoenix Capital was paying early investors with proceeds from the bond sales to new investors. Nor can the Article's characterizations of Phoenix Capital as a "chimera" or a "part junk-bond dealer" (*supra* at n.1). *See Riley v. Moyed*, 529 A.2d 248, 253 (Del. 1987) ("It is never libelous to accuse one of doing a legal act although strong epithets are used in describing the act."). Plaintiffs flag the Article's statement that "'there's nothing stopping Phoenix from using the funds collected from retail investors' to pay other investors" (D.I. 16 at 6), but Plaintiffs excise critical language from the Article. That clause from the Article, in full, states that "there's nothing stopping Phoenix from using the funds collected from retail investors *to meet its obligations to the Wall Street behemoth* [Fortress]" (D.I. 1-1, Ex. A at 13 (emphasis added to show excised portion of quotation)).

---

a case (*Dunn v. Gannett N.Y. Newspapers, Inc.*, 833 F.2d 446 (3d Cir. 1987)) applying New Jersey Law when articulating their version of the governing standard for defamation. *See* D.I. 16 at 4-5.

13

Plaintiffs otherwise rely heavily on *Beneficient v. Gladstone*, No. 6:23-cv-376-JDK, 2024 WL 2338256 (E.D. Tex. May 22, 2024). D.I. 16 at 7. However, *Beneficient* is not binding precedent in this Court. *See Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same [district] judge in a different case." (alteration in original) (quoting *Camreta v. Greene*, 563 U.S. 692 (2011)); *Wahl Clipper Corp. v. Conair Corp. & Conair LLC*, No. 23-cv-00114-JCG-LDH, 2024 U.S. Dist. LEXIS 23526, at *2 (D. Del. Jan. 16, 2024) (confirming that out-of-circuit cases "are not binding on this Court").

For the foregoing reasons, the Court holds that the Article and statements therein cannot, as a matter of law, be reasonably understood to imply that Mr. Ferrari and Phoenix Capital were operating a Ponzi Scheme. The inferential leaps required to sustain such an implication are simply untenable. In light of the Court's holdings, the Court does not need to address Forbes' argument that the alleged implication is "a constitutionally protected opinion" nor Forbes' argument that Plaintiffs failed to sufficiently allege "that Forbes published the alleged implication with actual malice." *See* D.I. 9 at 1, 11-21.

## VI.    CONCLUSION

For the following reasons, the Court grants Forbes' Motion to Dismiss Plaintiffs' Complaint (D.I. 8) and dismisses Plaintiffs' Complaint without prejudice. An Order consistent with this Memorandum Opinion will be entered.